Your Honors, my name is Mark Thomas. I'm the attorney for Ms. Utless George, a appellant in this case. I'm from Chicago, Illinois. This is case number 0272673. I believe that this is a really simple case. It became convoluted by the actions and conduct of an immigration judge. I believe that the judge abused his discretion. He did not find adverse credibility with any legitimate nexus or reason to do so. And he also violated the law with respect to an issue of Convention Against Torture Claims. Counsel, let me ask you a little about the credibility. My tentative thought was that when she had her interview on what her credible fear was, she didn't mention anything about a three-month period of torture and persecution or the severity of it. And it can't be said that it was just poor translation or an initial white pass, because she gave all sorts of detail about other kinds of mistreatment. Her discussion about her father's death and prior employment was somewhat conflicting. And in addition, she just flat out misrepresented whether she had applied for asylum in Greece. And that's not all of it. I was kind of disturbed when I read her characterizations of these horrible things that were done to her. And then I discovered that what it's about is yelling at her and telling her that she was tortured in front of her parents or something. And then it turns out all they did was grab her by the arm and drag her out of there. Not polite, but not torture. I don't get why that isn't enough. May I respond? Please do. Thank you. First of all, the credible fear interview took 22 minutes. There were 29 questions asked, four pages. The last page was a signature page. The first page was an instruction page. The second page was a biographic page. They only asked her two questions with respect to why she left Iraq. In a 22-minute interview, she cannot, and it should not be required, to state the same things that she provides for in a six-day trial. If she had more to say, why wouldn't she say it? Because it wasn't provided. There were 200 people interviewed on the same day by ten district councils or asylum officers. It was in the newspaper, in every newspaper in the United States. It was in the Wall Street Journal, the New York Times, the Chicago Tribune, and the San Diego Union Post. I mean, they knew exactly who was coming into the United States. As a matter of fact, there was a picture of an uglass George holding a baby, except it was a different woman. So she didn't represent them. So 20 interviews per officer per day. Yes, sir. So they each lasted approximately 22 minutes. I would think a three-month period of torture would be, yes, something that would come up. Three-month period of detention, possibly. Also, you have to consider the fact, sir, that she was in custody for over a week in a prison, threatened with deportation, had been sleep-deprived, and also was tired. Moreover, that has absolutely nothing to do with the central claim of her case. What about Greece? Remember, the question isn't whether we can come up. They asked her whether or not she filed for asylum in Greece. She did. She did no. She said, I filed for the U.S. Embassy through a priority basis. And that's a factual answer. In other words, she thought that the first question meant to do applies to have asylum in Greece by the Greek government. And she stated in her statement to the credible fear interview and to the asylum during the asylum trial that she filed for the United States Embassy through a priority basis to get refugee status, and it was denied. Counsel, you know. And had nothing to do, you know, frankly, sir, whether she filed for asylum in Greece or not has nothing to do with her credible fear interview. No, it doesn't. I don't even understand. What is the asserted contradiction? She said in her credible fear interview, did you apply for asylum in Greece? She said, no, but I applied for asylum in the United States, essentially, is what she said. While I was in Greece. She filed at the United States Embassy through the ICMC. Right. While I was in Greece. While she was in Greece. Then what did she say at her hearing? She did that. She did say that at her hearing. So what's the contradiction? I don't know. I have no idea what a contradiction is. Counsel, you know, the way we're supposed to review this is we're not supposed to see if there's a way to read the record consistently with her view of it. There certainly is, as you have laid out. It's really whether there's a way to read the record consistently with the BIA's view of it. Well, the BIA didn't make a decision. I.J., in this case. And all he did was speculate. He looked at a record of death for her father that occurred ten years before she left the country. And when she wasn't there and wasn't present and didn't go to the hospital or didn't go to the police station or to the security office where he was taken and said, well, the hospital record says he died on arrival at the hospital and it said he died of a heart embolism. Therefore, you must not be credible because you said your father died of torture. The man, she testified previously that the man was in prison for five months from October of 1985 until February of 1986. She testified that she witnessed the bruises on him. She also testified that five months he lost his business. And then testified five months later that the gentleman went back into the same security office where he was at and he was called, his family was called, not her, her uncles, that he's dead. Now, the government of Iraq is the most brutal and repressive regime that there is. As a matter of fact, we just invaded their country for those very reasons. And we claim now that this woman has no reasonable fear or that her father wouldn't have a fear of going there. And he died. The judge speculated and used conjecture as to why she died. Let me tell you something that I read in the transcript that would have made me think this woman is trying to put me on. I look at page, the page is starting at 283. Okay. Were you ever physically harmed by agents of the Iraqi government? And she says it was simple beating. And then I find out from the subsequent questions what she means by simple beating. Pushing, slapping, insults. And then the question, I'm just talking physical harm. No, there's nothing. So it's pushing and slapping, that's it. Pulling me from my chair from my hands, for instance. Gee whiz, if that's what she's calling beating, it means I can't accept any of her generalizations that describe what happened to her. I always have to find out. And then when she's saying she was, I think at one point she said she was beaten or tortured in front of her parents. And I find out at page 285, lines 7 through 12, all she means is they held my hand, they dragged me from the room, they pushed me to a car, they took me with them. Well, again, that means I can't trust anything this woman says until I find out the exact physical details. Why not? Because she uses inflammatory generalizations for things that, my gosh, the police in the most civilized countries in the world will drag a person or push them into their car and hold their hands when they do it, whether it's in front of their family or not. If you have a heated argument with your wife and you make an offensive touching to her, that's considered spousal abuse under the law in the State of California and in Illinois. In an Iraqi society where you have the most brutal and repressive regime, when the Amman security police come to your home, you tell them that. So if a cop in Iraq does exactly the same thing as a cop in Pasadena, even though in Pasadena it wouldn't be torture, in Iraq it should be counted that way because under the fascist regime they had and the cultural feelings that they had, it's worse. You're suggesting, Your Honor, that when a police officer in Pasadena slaps people in the back of the head, kicks them, pulls them by the hand, pushes them around, insults them and calls them names? That is persecution and that is torture under the definition of torture and the Convention Against Torture. Right now we're talking about an adverse credibility question. And there's no basis for it. Just a minute. Excuse me. If there the kind of evidence that Judge Kleinfeld is talking about is in the record and the issue, I don't understand it to have been disbelieved, so there's a question about whether it would support persecution, but that's not what she was rejected of. Am I right about that? She was rejected on the ground that she wasn't credible. On basis that had nothing to do with the basis of her fear. So if we had – This woman ran away from Iraq. If we thought there was a question about whether even on her story she was actually persecuted, we would remand to the BIA. I believe so. Is that right?  Okay. I also believe that this woman's story is based on the fact that events that occurred in 1996, 10 years after the events that occurred with her father. It has nothing to do with it. She fled the country. On March 29, 1996, she was accosted by Amman security police at her place of employment and said, we want you to be an informant and a spy. She refused because it's a violation of Christian principles. On April – I should say that the one piece of this that I do find troublesome that I'd like you to address is the three-month detention. That was in 1987. Right. But it was – it's true that you read through this credible fear interview and she says, I had problems and they are – and she tells the story about the hotel and them asking her to spy on people. And she says that they treated Christians badly and we had no rights. But she doesn't say anything about what would seem like a fairly important thing, which is having been detained for three months. Yes, she didn't, frankly. So what? What does that have to do with the central part of her claim? What does that have to do with the events that occurred in 1996? And she related it to – That's an evasive answer. That's an evasive answer. It doesn't even have to do with any of those things. All it has to do with is whether the woman is believable. She lost on the basis of credibility. So what we're supposed to focus on is whether a substantial basis in the whole record for the finding of lack of credibility. If there is a substantial basis in the record as a whole that supports the BIA's finding of no credibility, then even if we would reject it, even if we would find her credible, even if we can see a basis in the record pursuant to which they could have ruled the other way, she loses. That's administrative law. I understand that if you find one reason and there isn't one reason. The fact that she did not mention that during the credible interference Excuse me. There's a bigger problem here, I think, which is let's suppose the three-month detention didn't happen. Does she have a basis for finding – for asserting past persecution? Yes, in 1996. Which was? Which was the event where they asked her to become an agent for the government. Right. And what did they do? They kept her in detention for two days. They slapped her. They pushed her around. They pulled her hair. And you think that would be enough by itself to support a past persecution? Absolutely. In my opinion, the fact that she fled Iraq and her brother left the military and fled Iraq by itself was sufficient for persecution if she returned. I believe there's an error in the law. Well, is there a record – I was going to ask you about that, too. Is there any evidence in the record with regard to the general treatment of people of her group, i.e., Christian – was she a particular kind of Christian? She's an Assyrian Chaldean Christian, yes. Is there evidence in this record that would suggest that whether we believe her story or not, her original story, that she had a credible fear of future persecution? Yes. In the country's reports for human rights practices, over a half a million Christians had been removed, 140 churches had been destroyed, 182 villages had been decimated, 19 cathedrals, 5 monasteries, 11 nunneries. There's been a pattern and practice of persecution. Did she make this argument? No, she did not. I was not her counsel. That argument was not made. Okay. The Iraqis have treated Christians terribly ever since they became an independent country. Yes, sir. That's perfectly true. But as far as I could read in her account, she got a job in a five-star hotel as a telephone operator, and the government said, would you please spy for us on the Americans? She was owned by her cousin. He's a Christian. I guess all Christians aren't getting kicked around as badly. They have some hurts. You know, if you pay off the government enough, you've got a business. But her cousin owned the hotel where she was asked to be an agent. When she refused for her own principles, that's when she was placed into custody for two days. I guess a larger problem that has never been addressed by the Court is the fact that for the Convention Against Torture is a distinct and separate claim. As this Court in the Seventh Circuit has recognized, it has nothing to do with the credibility of the applicant. In a 1996 and 1996 case. It has something to do with the credibility of the applicant. Do you have to agree? Actually, no. In the cases that you decided in Al Harden, for example, that man changed his story six times. But you determined that. That wasn't a Convention Against Torture case, and it is why I asked you the question. Based on. But you're telling me the theory isn't in the case. Based on the documentary evidence, the Court determined that there was a significant possibility that that person could be tortured and be returned to Iraq. We thought it was going to be real bad for him if he went back, no matter who he was or what his true story was. But in this case, I don't understand why we should think that. Any Iraqi would have that problem. I'm honest with that, Judge. They can't waltz in. When Saddam was there, you can't waltz in. There's no airplane flights. They fly you to Jordan. They put you in a car. They drive you to the trivial post, and they hand you over with no documents. Now, in all honesty, sir, you're an intelligent man. What is a security officer in Saddam Hussein's regime going to ask you? Who are you? Where have you been? Who's your family? What did you do? They have a whole record. I mean, there's an Amman security office in every neighborhood in Iraq. There's a Baath security office in every neighborhood in Iraq. They know who the people are. We acquired 4 million documents from that government when the Kurds were raided in 1991. We know that they have paid rapists. We know that they have paid informants. We know that they torture people. And simply because they abused this woman, maybe not as bad as what the judge might have thought of, but or less than what the judge thought, doesn't mean she didn't have a reasonable fear. Was there ever a moratorium? I know that the INS or the government at points has sort of moratoriums on sending people back to certain countries because of the circumstances there in general. Was there ever such a thing about Iraq? Or were we just sending people back to Iraq all the way through? They were sending criminals more than others. And fortunately, because of the appellate process, it took a long time. They have sent people back, yes. And they do send them back for trivial. Does it matter that we removed that monstrous government? Now, yes, it does matter. There is a change in country conditions. Literally, for Christians, it's worse. And if you follow Mr. Bremmer's argument, there's going to be a he's already agreed to have an Islamic government. There is objection in our Congress, but he's already agreed to that. And if that happens, then there's going to be a wholesale slaughter. They're terrified. And they're moving out by the hundreds. There's no place for them left in the country. They are the indigenous people of Iraq, and they're the only ones left. They're the American Indian of Iraq, and they're being slaughtered. Nineteen churches have been closed since the government of the United States went in. Eight of them have been converted to mosques. No woman can wear a cross. No man can wear a cross. No woman can walk outside without a hijab or a bayat. We're getting very far from that. I know. There's a different basis, Your Honor. None of that was argued in the previous brief because Saddam hadn't been overthrown yet. But there are other issues that have to be considered. This woman has another basis. Could you file a motion to reopen at this point? To the Board of Immigration Appeals? No, I have not yet. But could you? Yes. Thank you, counsel. Thank you. Good morning. My name is Kurt Larson. I represent the Attorney General in this case. My question is about George's request for asylum relief. George's request for asylum relief and torture conviction protection lacks credibility. The immigration judge was ---- Could you look up a little? It's hard for me to hear you. Sorry, sir. The immigration judge listed specific and cogent reasons why he found George to lack credibility. Well, some of her reasons were really ridiculous, such as the difference between whether the father built ñ made a metal ñ an iron door or a metal fence. So it's a little difficult to take her judgment very seriously. He gave about four or five pages of discrepancies and inconsistencies. Some were major. Some were minor. But, again, we look at the totality of all of these inconsistencies and discrepancies to find, in fact, that the individual did lack credibility. Even if you find ñ Let me just say my problem. We know these asylum interviews are perfunctory. And we have a case ñ let me read you the language. Requiring evidentiary detail of an airport interview not only ignores the reality of the interview process, but would, in effect, create an unprecedented pre-asylum application process. That's from Sing Against the United States, the Ninth Circuit case of 2002. Are you familiar with that case? In general, sir, yes, Your Honor. Are you familiar with that language? Yes, Your Honor. Do you see how it would create an unprecedented pre-asylum process? It's not unprecedented, Your Honor. Well, the case says it is. That's our law. You may disagree with the law, but I think you've got to accept the Circuit's statement of it. So it's unprecedented. Why should we depart from precedent, then? There's three points. There's three major sections. Now, I'm asking you a direct question. Why should we create a new precedent? I'm answering that, Your Honor. All right. You've got three reasons for that? I've got three different sections. Sections, okay. First of all, the immigration judge didn't specifically base the lack of credibility on the initial fear versus determination versus what was said in the testimony. He also based, also, let's put that to the side. So we're not going to create a new precedent. Let's put that to the side. All right. My first question is why should we create a new precedent? You say we're not going to. What's your next reason? Because the immigration judge just didn't rely on the credible fear testimony. That's your second reason. Is that right? You said you had three reasons. Do I understand you correctly? Yes, Your Honor. All right. The first two you've given, we're not creating a new precedent, but I thought you said we had a reason for creating a new precedent. Was I wrong? I'm trying to explain, Your Honor. The point is to explain. Can I just ask a question which may be clarifying as you go into this discussion? And I know you look perturbed. My understanding is that there are actually two kinds of interviews that take place. One is the airport interview as soon as the people get off. Just tell me if this is true. As soon as people get off the airplane. And the other are these credible fear interviews, which are somewhat more formal proceedings. Is that much true? Pretty much, yes, Your Honor. And when we were talking in Sing, which one were we talking about? We're talking the one at the airport. But again, one of the things we have to remind ourselves is when the interviews are done, they're done in the normal course of business, and the interview, the person doing the interview has a duty to elicit as much information as he can out of the individual requesting asylum. It's a regular course of business. 22 minutes, is that correct, about the time? Your Honor, I don't know the time, but I will go on. I would acknowledge 22 minutes, Your Honor. But I think you were – I don't want to cut you off. You had three reasons, two of which didn't seem to apply, but you have a third reason for us to create a new precedent different from Sing. I guess I was trying to explain myself, Your Honor. All right. Explain it then. Right. The immigration judge just didn't specifically rely on the credible fear interview versus the testimony. All right. Let's put that aside. What does he rely on? He's relying not only on that. He's also relying on the differences between the asylum application and what he said and what she said in her testimony. Now, let me say something about that since we're going to talk about that. So now we're going to move just to the application, is that right? Take it, Your Honor. You're just contrasting the application with the testimony. With the testimony. Okay. In her asylum application, George stated that after her father's death, she was detained sometimes for two or three days, interrogated and accused by being a spy on several occasions, and beaten, beaten and treated cruelly. Compare it to her testimony in front of the immigration judge where she said during these interviews, no harm came to her and she was not injured in any way, in any way. Moreover, she stated that she was questioned for four or five hours, not two or three days. Huge discrepancies. Where is the – on what page is the? 174 to 569 is the comparison, 182. Okay. Thank you. Do you have any experience with asylum applications? Yes, Your Honor. Do you know how they're prepared? Asylum applications? They're prepared with their attorney. And that's a really good point, Your Honor. You know what the greatest, easiest analogy with them is? Allegations. It's as though you took allegations in a complaint and started to say that the witness in the trial was lying because the testimony at the trial was different from the colorful way the allegations were put. I mean, it's a legal document. It's not to be taken very seriously. It's ridiculous to take it seriously. And I'm sure we've got some other cases which are not at my fingertips, but I'm sure there are other cases saying we don't take asylum applications as a test of truth. They're just getting the case started. You must know enough about the immigration process to know that's true. Thank you.  I appreciate that. But I would suggest that the judge read pages 190 to 199 of the administrative record, which specifically goes into detail how the immigration judge stated, listen, I want you to know something, and I want you to know something specifically. I rely on this asylum application, and I want you to know that it's going to be something that I'm going to look at to see the differences in what you're saying today and what you said in your asylum application. And I want you to know something. I'm going to depend on that to make my credibility determination. And he spent nine pages, nine pages, Your Honor, discussing it with the attorney and stating, okay, I want you to rely on this so much that I'm going to give you an extra month to try and make any changes you want to make. Okay. So what are the discrepancies? I mean, the main thing that was missing from the credible theory was in the asylum application, a three-month detention. Three-month detention, there's a couple. So what else? What other issue is there? Let's look at the – let's start with that. Several instances were mentioned in her testimony. They're not mentioned in her credible fear interview. Now, I thought you were going to drop that. Let's stick with the application. Right. Let's move over to the application. That's what I thought we were doing, though. Okay. I'm sorry. Those are the big ones. She also claims that she was detained for two days after she quit her job at the hotel. Testified that officials did not use physical harm against her during this time. So the difference is that she said in the asylum application they did use physical harm, but she said in her – I'm just trying to be really clear about this. Right. But she said in her testimony that they didn't use physical harm, but that it did detain her for the two or three days. Right. She said in her application she said she was detained a couple of times for two or three days. In her testimony, she said she was never detained for two or three days. It was four or five hours. In her asylum application, she said she was beaten. In her testimony, she said she wasn't beaten during these times. But there's more than that. And I think it's a very interesting point that was brought up concerning the asylum – the request for asylum in Greece. She was asked point blank, have you applied for asylum in Greece? She stated no. When was that? I'm sorry. That was at the credible fair. But she said in the next sentence that she applied to the U.S. Embassy. That just seems like your weakest point. It's one of the points out of the whole. But she said in the very next sentence. It was perfectly clear, absolutely clear in that credible fair interview that she was talking about two different things. Well, I think that if you look at the testimony that she – that was elicited during that time in front of the immigration judge concerning her, she had applied for asylum in Greece. She was very invasive on her answers. And finally, on cross-examination, they said, well, did you really apply for asylum in Greece? Yes, I did. Do you have anything to prove that? Yes, I do. It's right here in my purse. And they turn to the attorney. They go, have you seen this all? No, this is the first time I've seen it, Your Honor. But she did say in her credible fair interview, in no uncertain terms, that she had done that. I think she initially stated that. But she couldn't have been hiding it because she said it from day one. Right. I'll be honest with you. I thought it said that she stated no. You all hold the U.S. I'm sorry. When did she state no? In her credible fair. No, she did not. She said, no, I didn't apply for asylum in Greece. And the next sentence was, but I did apply to the United States embassy for asylum in the United States while I was in Greece. I'll be honest with you, I didn't see that. That's my fault. What page are we looking at? Credible fair. It's on, it's hard to tell the numbers, 363 and 364. Thanks. Did you apply for asylum in Greece? No. Why not? My mother is in America. That's why I wanted to come to America. If you had a right to come here because of your marriage, why did you purchase false travel documents? We asked in Greece at the U.S. embassy for permission to come, and they denied us. Do you have an application or petition pending with the United States Immigration Service?  I put an application in Greece to come live in the United States. That's different from an asylum. A request for asylum could have been asked for a visa to come over here to work. Do you think she knows that difference and she's lying by making that distinction? That's one of the four pages that the immigration judges went back and forth and showed. I think there are some issues here about credibility, but that one I think is really, really weak. I'll give in to that. Do you know who the immigration judge was? Who the immigration judge was? Yes. What's that? Do I know him personally or? Do you know who the judge was? Yes, Your Honor. What? Yes, Your Honor. What's his name? I can tell you his name, I think. I'm looking for it. Well, if you know it, Your Honor. What's that? I'm looking for it, but if you know it, it's probably. Well, I believe it's Ignacio Fernandez. Okay. I noticed him because he was in this case and another case and he's been in other cases we've had. Now, when you prepare a case, I don't know how often you come here, it makes some difference who the judge is. At least speaking for myself, if we have an appeal from a district judge, I only want to know who the district judge is because they vary in quality. And it's also true of immigration judges. Some are good, some aren't. This judge, as I've observed in this case, and I think the case you're about to argue, are you going to represent the governor in the next case? No, Your Honor. Oh, well. He's in both cases. He's an extraordinarily aggressive judge. It's hard to see him as having a neutral temperament. Counsel, I want to dissociate myself from this. While I occasionally notice who the judge is, I don't with IJs because I don't know any of them, nevertheless, I just apply to a lot of the facts as though the judges are interchangeable parts. I myself feel like the law is the law and you can't make it different for different people. So we may have different views when we ask you questions like this. Sure, I'll take some burden. Anyway, thank you for interrupting me, Judge Kleinfeld, but I didn't quite finish my statement. Since some judges are sensitive to the abilities of the fact finder, you want to prepare yourself with just a little advice. Now, can I say something, Your Honor? You may. You know, I've got a duty here. I'm a reference to the Department of Justice, and one of the things I've got to show you is specific and cogent reasons why the immigration judge found this person to be incredible. And I think the immigration judge has done that. And because the immigration has done that, you have to, this Court has to, uphold the decision. What if what – and I'm going to let you go, but I guess my overall feel as a record here is that some of the reasons he gave were really terrible and that some of them might, in fact, be okay. So what do we do with them? Well, maybe. Because we're looking at – we look at the totality of them. Some you can discard. Some you can say it's there. Even if you found one. But that's a strange way to proceed, only because when anybody makes a credibility determination, at least when I try to decide whether to believe somebody, I sort of go over a whole set of circumstances and I come to an ultimate conclusion. If the judge has done that and has given us a whole bunch of circumstances, we don't know whether if we said, well, four of these reasons you just have to forget about, what would you say about the other two, if it was only the other two? Right. And I think it's a matter of interpretation, too. Again, going back to the question of whether or not she applied for asylum in Greece, not only did he listen to her testimony, he saw her demeanor in court and said, you know what, I don't believe that in your initial interview when you said no, I think you were really saying that you didn't apply for Greece, asylum in Greece. And it was only on cross-examination. We finally got out of you that you actually did apply for asylum in Greece. So I'm going to call that an inconsistency because of the reason. Well, what did she ultimately say? She ultimately said something. I mean, I don't want to keep arguing about this. Right. What she ultimately said at the end of her testimony was exactly what she said. I mean, unless you're going to get distinction about she applied, she didn't apply for asylum, she applied for something else from the point of view of somebody who was trying to come to the United States. She did apply to come to the United States and she said that all the way through. That's a lousy reason. But there are other reasons that aren't so lousy. Right. Like the three-month detention. Right. All right. So basically you're saying we should just look at the reasons that are reasonable. Specific to Israel. Right. They're both way over time. Unless you request it, I will. I'm here for you. I'll take any questions that you have. Thank you, counsel. I think both sides went about five minutes over time. I'd like to say to you, Mr. Thomas, that you presented one of the best prepared and effective arguments on behalf of a petitioner I've heard. And we are so often disappointed in the quality of the immigration bar that you stand out. And I'm very happy you made the presentation. Thank you, counsel.
judges: Noonan, Kleinfeld, Berzon